303 Ga. 614
FINAL COPY

S18A0241. FLOWERS v. THE STATE.

BLACKWELL, Justice.

Nicambreon Flowers was tried by a Gwinnett County jury and convicted of murder and armed robbery in connection with the fatal shooting of Joel Tengue. Flowers appeals, arguing that the evidence is legally insufficient to sustain his convictions and that the trial court erred when it charged the jury. We find no reversible error and affirm.[1]

1. Viewed in the light most favorable to the verdicts, the evidence

---

[1] Tengue was killed on April 19, 2014. Three months later, a Gwinnett County grand jury indicted Flowers, charging him with murder with malice aforethought, murder in the commission of an aggravated assault, murder in the commission of an armed robbery, aggravated assault, and armed robbery. Flowers was tried in January 2016, and the jury found him guilty on all counts. The following month, the trial court sentenced Flowers to two concurrent terms of imprisonment for life, one for murder with malice aforethought, and the other for armed robbery. The other counts merged or were vacated by operation of law. See Malcolm v. State, 263 Ga. 369, 373 (5) (434 SE2d 479) (1993). Flowers filed a timely motion for new trial in March 2016, which he amended in February and March 2017. Following a hearing, the trial court denied the motion in June 2017. Flowers filed a timely notice of appeal, and the appeal was docketed in this Court for the term beginning in December 2017 and submitted for decision on the briefs.

presented at trial shows that Tengue exchanged text messages with a putative buyer to arrange the sale of a quarter-pound of marijuana. Tengue agreed to meet the buyer at the Astor Place apartment complex in Duluth, and Tengue asked Khalil Higgs to accompany him because he felt "uneasy about the situation."[2] When Tengue and Higgs arrived at Astor Place on the morning of April 19, 2014, they contacted the buyer, and he directed them to the 500 building of the complex. Tengue and Higgs pulled up to the 500 building, where they saw Flowers[3] standing in a breezeway of the building. Flowers invited Tengue to accompany him into the building, but he would not let Higgs come along, and Higgs agreed to wait in the car. Carrying a blue backpack, Tengue walked with Flowers into the breezeway, where they disappeared from Higgs's view. Higgs then heard a popping sound (like a firecracker),[4] and he called and texted Tengue but received no response. Higgs saw a woman walk down the

---

[2] According to Higgs, he understood that they were going to Astor Place to transact a sale of shoes.

[3] Higgs was not personally acquainted with Flowers, but he identified Flowers — before trial in a photographic lineup and again at trial — as the man whom he saw at the 500 building of Astor Place.

[4] Around this time, a resident of the 500 building saw a man wearing a black jacket running down a trail in the rear of the building. Higgs said that Flowers was wearing a black jacket.

breezeway, and he heard her scream. Police officers soon arrived on the scene, and they found Tengue lying in the rear of the 500 building. Tengue had sustained a fatal gunshot wound to his back.

Officers linked the phone used by the buyer to Flowers, and they then searched Flowers's residence, which was located in another apartment complex only a few hundred feet from Astor Place. In a bedroom associated with Flowers,[5] officers found Tengue's blue backpack. Cell phone location data confirmed that Flowers's phone was in the vicinity of Astor Place at the time it was used to exchange text messages with Tengue. And cell phone records indicated that the phone was used to communicate with Flowers's brother and girlfriend soon after the shooting.

Flowers was apprehended in Mississippi a few days after the shooting. When he was arrested, he denied any involvement in the shooting, but he also made several self-serving statements that were highly implausible. For instance, Flowers claimed that someone had stolen his phone about two hours before the

---

[5] About a month earlier, a detective (who was at the apartment in connection with an unrelated investigation) observed Flowers enter the bedroom in question. And when officers searched the bedroom following the killing of Tengue, they found banking documents containing Flowers's name and phone number.

shooting, and when he tried calling the number, an unknown thief answered and claimed ownership of the stolen phone. When an investigator pointed out that Flowers's phone had been exchanging text messages with Tengue for several days prior to the shooting (and long before the phone allegedly was stolen), Flowers denied any knowledge of those messages and said that other people used his phone regularly. When the investigator asked why Flowers's phone was used to contact his brother and girlfriend shortly after the shooting, Flowers responded that the thief must have done so. When the investigator asked Flowers about the blue backpack, he claimed that the backpack was his own. But when the investigator noted that Tengue's shoes and schoolwork were found inside the backpack, Flowers changed his story and said that someone else must have brought the backpack into his home, offering that other people regularly visited his apartment. An audio recording of these statements was played for the jury at trial.

Viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find beyond a reasonable doubt that Flowers was guilty of the crimes of which he was convicted. See

<u>Jackson v. Virginia</u>, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. The trial court charged the jury on parties to a crime,[6] and Flowers contends that the giving of this instruction was error because there is no evidence that Tengue was killed by anyone other than one person acting alone. Even if the charge was erroneous, we are convinced that it was harmless. See <u>Hammond v. State</u>, 289 Ga. 142, 144 (2) (710 SE2d 124) (2011) (nonconstitutional errors in jury charge are harmless if "it is highly probable that the error did not contribute to the judgment") (citation and punctuation omitted). The evidence against Flowers is strong. The theory that someone other than Flowers was involved in the crimes is based principally on Flowers's own self-serving statements, which, as we have noted, were highly implausible and inconsistent. The jury was properly charged about reasonable doubt and the presumption of innocence, the elements of the crimes charged, and that its verdict could be based only upon the evidence. See <u>Drake v. State</u>, 272 Ga. 797,

---

[6] Specifically, the trial court charged the jury: "Every party to a crime may be charged with and convicted of commission of the crime. A person is a party to a crime only if that person, (a) directly commits the crime [or] (b) intentionally helps in the commission of the crime."

5

798 (3) (537 SE2d 336) (2000) (in assessing whether an instructional error was harmless, "we examine the charge as a whole"). And no one at trial appears to have even suggested that anyone other than a lone shooter was involved in the killing. Indeed, in closing argument, the prosecuting attorney said: "The evidence that we have — let me be clear — is this was just the defendant and the victim, just the two of them back there [behind the 500 building]." It is highly probable that any error in charging the jury on parties to a crime did not contribute to the verdicts, and any such error does not warrant a reversal in this case. See Hammond, 289 Ga. at 144-145 (2). See also Francis v. State, 266 Ga. 69, 72 (3) (463 SE2d 859) (1995).

Judgment affirmed. All the Justices concur.

Decided May 7, 2018.

Murder. Gwinnett Superior Court. Before Judge W. Davis.

Jessica R. Towne, for appellant.

Daniel J. Porter, District Attorney, Lee F. Tittsworth, Robert D. Wolf, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.